**WEST SIDE LUMBER CO v WARNER**

Ohio Appeals, 2nd Dist, Montgomery Co

No 1400. Decided June 22, 1937

Ozias & Ozias, Dayton, and W. S. Rhotehamel, Dayton, for plaintiff-appellee.

Herbert Duffy, Attorney General, Columbus, and George E. Nichols, Dayton, for defendant-appellant.

**OPINION**

By BARNES, PJ.

The above entitled cause is now being determined on appeal, on question of law and fact, of the defendant, the Superintendent of Building and Loan Associations of Ohio in charge of the Miami Savings & Loan Company of Dayton, Ohio.

On January 20, 1934, plaintiff filed his petition with the Clerk of Courts in and for Montgomery County, Ohio, praying for the allowance of a preferred claim on an amount due it from the Miami Savings & Loan Company.

The petition averred that under a contract the sum of $215.74 was held by the Miami Savings & Loan Company as a trust

fund. The averments of the answer admitted the amount but denied that the same was held in trust. It is the claim of defendant that the amount was carried in the books of the association as a running stock account.

By agreement the cause is submitted in this court on the transcript of evidence taken in the trial court and included therein are certain exhibits.

The following brief recital of facts will render understandable the nature of the controversy. On or before May 25, 1929, a man by the name of Janney negotiated with Alfred Poliquin, Jr., for the sale of a property located in Dayton, Ohio. Janney previously had erected a house on these premises. The West Side Lumber Company had furnished material and there was a balance due to them from Janney. In financing the proposition it was necessary for Poliquin to raise $4446.00. The Miami Savings & Loan Company would loan $4000.00 but not the entire amount desired. It was finally arranged in order to carry out the deal, that Poliquin and his wife would borrow from the Miami the sum of $4000 executing therefor their note and a first mortgage security. A second mortgage was executed to the West Side Lumber Company for the sum of $446.87. These papers apparently were all drawn up and executed at the place of business of the Miami Savings and Loan Company. During the negotiations the question was raised by Poliquin as to the place of payment. The $4000 mortgage executed to the Miami provided for monthly payments. It was also agreed and stipulated that monthly payments should be made on the second mortgage executed to the West Side Lumber Company. The amount of payments was to be $10 a month and to continue until such time as the principle amount of $446.87 and 7% would be paid. Poliquin objected to running out to the West Side Lumber Company's office each month to make these payments. An arrangement was made whereby Poliquin might make the monthly payments on both mortgages at the place of business of the Miami.

The contract under which this plan was adopted is claimed to be the contract under which the Miami received the $10 monthly payments from Poliquin as a trust fund. In order to determine whether or not the verbal negotiations or contract made this amount a special fund it is necessary to examine the record in order to ascertain the exact provisions of the arrangement.

The only witness called by the plaintiff was E. B. Lupinske, the assistant secretary and treasurer of the West Side Lumber Company. We now quote from the record so much of his testimony as relates to the arrangements through which the $10 monthly payments were to be paid to the Miami. Starting on page 7 of the record this witness was requested to tell the whole story and the following is his answer:

"A. The West Side Lumber Company had sold to George Janney lumber for a number of houses. We had a second mortgage on one of the Janney houses and threatened foreclosure and Mr. Waitman, at the Miami Building & Loan, asked us not to do so because it would ball up their records for the reason that several of Janney's houses sold on contract were about to be deeded to the original buyers and new loans made. So, in the case of Poliquin they made a loan of four thousand dollars to him. Janney gave a deed, of course, to Poliquin and there was $446 approximately due the West Side Lumber Company. The Miami Building & Loan didn't see fit to grant a $4,446.00 loan, they would only grant four thousand. So I asked Mr. Waitman where we would come in. He said, 'Well, you can take a second mortgage and Poliquin will pay us $40.00 a month and pay the West Side Lumber $10.00 a month on your second mortgage.' And Poliquin says, 'Yes; but will I have to come in to the Miami every month and pay $40.00 and then go out to the West Side Lumber Company and pay $10.00?' He says, 'That's too much of a trip to make; I work at the Master Electric and I can't do it,' and Waitman says, 'That's all right. We'll fix it so you can pay $40.00 to the Miami on our account and then leave $10.00 here for the West Side Lumber Company to apply on their second mortgage. We will enter it on a pass book and say every six months, July 1st and January 1st you can drop in and get the money that was left there by Poliquin for the West Side Lumber Company.' That is really the whole thing."

On page 9 of the record this same witness was asked as to what kind of a book the Miami Savings first gave them and to that question he answered as follows:

"A. They first gave us a pass book they were using at that time, on which pen and ink records were made that is, hand written records were made."

While this witness was on the stand there was also presented, identified and introduced in evidence the following exhibits, plaintiff's exhibit "A," being the mortgage from Poliquin and wife to the West Side Lumber Company. Exhibit "B" being a photostatic copy of a ledger sheet from the records of the Savings and Loan Company. Exhibit "C" being a photostatic copy and a continuation of the ledger sheet of the Savings and Loan Company. Also marked exhibit "C" the pass book issued by the Miami Savings & Loan Company to the West Side Lumber Company.

From these records it was apparent that the Poliquins were reasonably prompt in the making of their monthly payments. These photostatic copies of the ledger sheets show withdrawals were made by the West Side Lumber Company as follows: August 14. 1930, $140.00. This equaled the total amount that the Poliquins had paid in at that time. January 12, 1931, $50.00, and again this equaled the total amount paid in between the time of the withdrawal of the $140.00 and the date of the $50.00 payment. The ledger sheets show interest or dividend accruals at the time of the withdrawal of the $140.00. This amounted to $4.40 and at the time of the withdrawal of the $50.00, $5.02. The Poliquins continued to make the monthly payments to the Miami until and including October 22, 1932. The sum of these total continued payments was $210.00. The added dividends for interest were $5.74. No part of this amount was or has been withdrawn. On or about this date, the Miami went on notice. The West Side Lumber Company notified the Poliquins that in the future the $10 payment should be made direct to them and this was done. The mortgage introduced in evidence as plaintiff's exhibit "A" under the proviso clause, among other things, contained the following:

"Payments to be made at the rate of $10 per month until fully paid on a pass book in the name of the West Side Lumber Company."

The defendant presented two witnesses and none others. Both of these witnesses were connected with the Miami Savings & Loan Company. The first Mr. Irvin Weckesser had occupied the position of teller and Mr. John F. Waitman was the other witness, he having been the general manager of the Miami. Mr. Weckesser's testimony related principally to the nature and character of the accounts carried by the Miami and other matters concerning the West Side Lumber Company's account. He was not present at the time of the making of the original arrangement. The other witness Mr. John F. Waitman denied any arrangement or agreement whereby these $10 payments were to be segregated into a special account. He made the statement that he had been connected with so many different set ups that he was not able to give in detail all the conversations that took place at the time of and previous to the deal known as the Poliquin deal.

From the evidence. even if given the most favorable construction in support of plaintiff's claim, we are unable to determine that any trust relation was created. From the narration of the conversation and the record evidence there is nothing to indicate that these $10 payments were to be segregated and held as a special fund. The agreement that the amount was to be carried in a pass book and withdrawals to be made therefrom every six months contradicted any claim of a segregated account. When the West Side Lumber Company took and accepted a pass book and consented to payments being made in this way, it at once accepted the Miami as its debtor as payments were made.

The Building and Loan Association as the name implies was a financial institution. When money is taken in over a counter of a bank or building and loan the deposit is presumed to be general in its nature. The case of Squire v Oxenrighter,. 130 Oh St is pertinent. While the cited case referred to a bank the reasoning is applicable. The first syllabus reads as follows:

"In the absence of evidence to the contrary a deposit in a bank is presumed to be general in its nature."

Considering the evidence, including the exhibits in the instant case, there is not a scintilla of evidence from which there can be inferred an intention to treat this fund as a special deposit.

There is presented a further question essential to a proper determination and that is whether or not the account could properly be considered a running stock account. We are firmly of the view that it can not be so treated and for the following reasons. In the first place, we have narrative of the arrangements made before the agreement was entered into by which these $10 pay-

ments were to be made by Poliquin. Not a single witness makes any claims to any statement about a running stock account. It was stated that the West Side Lumber Company did receive a pass book and this is in accordance with the writing contained in the proviso clause of the mortgage given by Poliquin to the plaintiff. It is quite true that a pass book may be given out either on deposit accounts or running stock accounts. The pass book in the instant case on its cover has the letters "Savings Account." Nowhere on this book or on the photostatic copies of the ledger sheets is any reference made to running stock account. In order to create a depositor of money a stock holder there must be something more than is shown in the record of this case. There is presented in evidence as an exhibit marked "Plaintiff's Exhibit No. 1" the receipt signed by the West Side Lumber Company for $50.00 and on the receipt it appears that the amount is charged to running stock account No. 24225. We do not think this receipt is sufficient to create a running stock account. There is some reference in the evidence to the check that was issued bearing some similar phrase. This evidence is not substantive of the fact that the account as originally opened was understood by the party to be a running stock account. On this proposition, it is nothing more than corroborative of any evidence that might be presented touching the understood arrangement. There being no such evidence there is nothing to corroborate. It is our determination that the account was a deposit account and the plaintiff is entitled to share in the assets of the Miami the same as other creditors. Of course, this means that the claim is prior to that of stockholders. We understand there is no dispute on the amount.

Entry may be prepared in conformity to this opinion.

HORNBECK and GEIGER, JJ, concur.